IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs August 3, 2004

## STATE OF TENNESSEE v. JAMES JOHNSON

**Appeal from the Criminal Court for Shelby County**
**No. 00-03451      Chris Craft, Judge**

---

**No. W2003-02009-CCA-R3-CD  - Filed October 20, 2004**

---

The defendant, James Johnson, originally charged with first degree murder, was convicted of second degree murder. The trial court imposed a sentence of twenty-three years. In this appeal, the defendant asserts that (1) the evidence is insufficient to support his conviction; (2) the trial court erred by denying his motion for a preliminary hearing; (3) the trial court erred by permitting evidence of a California police chase involving the defendant; (4) the trial court erred in its instructions to the jury; (5) the cumulative effect of the errors at trial require reversal; and (6) the sentence is excessive. Because the trial court misapplied certain of the enhancement factors, the sentence is modified to twenty-one years. Otherwise, the judgment of the trial court is affirmed.

### Tenn. R. App. P. 3; Judgment of the Trial Court Affirmed as Modified

GARY R. WADE, P.J., delivered the opinion of the court, in which NORMA MCGEE OGLE, J., joined and THOMAS T. WOODALL, J., filed a separate opinion, concurring in part and dissenting in part..

Michael E. Scholl (at trial and on appeal) and Gerald Skahan (at trial), Memphis, Tennessee, for the appellant, James Johnson.

Paul G. Summers, Attorney General & Reporter; David H. Findley, Assistant Attorney General; and Jerry Harris and Amy Weirich, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

The victim, Carolyn Payne, was last seen alive when she left her place of employment at 6:38 p.m. on March 14, 2000. Two days later, members of her family asked Officer Clyde Jefferson of the Memphis Police Department to go to a residence at 3334 Woodhollow, a rental property owned by the victim, to look for her. Officer Jefferson, who entered the residence with two of the victim's sisters and her cousin, found the victim's body wrapped in a blood-spattered blanket inside a closet. Officer Jefferson observed boxes inside the residence which suggested that the occupants were in the process of moving.

Lorece Delois Gunn, the victim's cousin, accompanied two of the victim's sisters to the Woodhollow residence, where they met Officer Jefferson. Ms. Gunn broke the glass of the back door, entered the residence, and, with the assistance of the officer, discovered the body. A ring the victim usually wore on her right hand was missing.

Kendra Wells, who had rented a room in the Woodhollow residence, moved at the victim's request one week before the murder. The defendant rented a separate room in the residence. Jennifer Royer, another tenant in the Woodhollow residence, had moved approximately one week prior to the murder. According to Ms. Royer, the defendant, whom she had seen argue with the victim on an earlier occasion, was the only tenant remaining when she moved out.

On the day after the victim's disappearance, the defendant paid cash for a room at a Red Roof Inn in Memphis. Tyshal Boone, who had known the defendant for approximately three weeks, met him there. The two had sex and the defendant paid her $50. Ms. Boone noticed that the defendant had a cut on his forearm. On the following day, she saw a news broadcast about the murder which showed the murder scene. Recognizing the location as the defendant's residence, Ms. Boone went to the scene and, while there, provided a statement to the police. At trial, she testified that the defendant did not call her on the day she talked to the police, even though he had promised to do so.

According to Roby Martin, a pawnbroker in East Memphis, the defendant pawned a woman's diamond cluster ring for $100 on the day after the victim's disappearance. Ms. Martin remembered the transaction because she had tried on the ring and it was a perfect fit. The defendant appeared "shaky" and "nervous" and "kept looking behind him" during the transacation.

Patricia Turnmire, an investigator with the Memphis Police Department Crime Scene Unit, found several boxes and a large amount of blood on the living room floor of the Woodhollow residence. There was a broken chair in the living room, suggesting that a struggle had taken place. While in the kitchen, officers discovered a household cleaning solution which contained bleach that had apparently been used to clean the blood stains. A doctor from the medical examiner's office discovered a knife partially wrapped in masking tape inside one of the boxes in the living room. Jeans and a newspaper found in a separate box were covered in blood. A receipt discovered in one of the upstairs bedrooms indicated that the defendant had pawned a woman's diamond cluster ring on the day after the victim was last seen alive. A used condom was on the night stand in that same bedroom. Officers found a bloody t-shirt in a garbage can in the downstairs bedroom. The victim's purse was underneath a dresser.

Shirley Echols, who was dating the defendant at the time of the murder, was at the Woodhollow residence on the date the victim was last seen alive. She was aware that the defendant was in the process of moving because the property was to be sold. After work that day, the defendant would not let her inside the residence, explaining that the door to his bedroom was locked. While Ms. Echols waited outside, the defendant entered the residence, took possession of a cordless telephone, and returned to her vehicle. She stated that the defendant was "acting kind of like in a hurry."

Officer Angelo Stewart of the Los Angeles Police Department saw the defendant two weeks after the murder. A check of his license plate indicated that the defendant was wanted on a felony charge. When the officer attempted a traffic stop, the defendant accelerated. Just inside San Diego, approximately eighty miles from the origin of the pursuit, the California Highway Patrol placed spike strips in the roadway to stop the defendant. According to Officer Stewart, the defendant "hit the spike strips . . . [and his] car just . . . veered to the right and suddenly hit a dirt embankment." When the dust from the crash settled, the defendant was sitting in the passenger seat with the door open, refusing to get out of the car. After the officers sent a police dog to "extract" the defendant from his vehicle, he ran in the direction of the officers. A San Diego police officer fired four "bean bag shots" at the defendant, who then fell to the ground. The defendant struggled with the officers as they handcuffed him and he was eventually taken to the hospital. Officer Stewart's partner, Officer Joe Cruz, testified that as the defendant ran toward the officers, he shouted, "shoot me, shoot me."

Officer Jamie Luna of the Los Angeles Police Department, who stood guard over the defendant during his hospitalization, testified that the defendant explained that he had tried to kill himself by wrecking the car because "no one [was] going to believe that [the victim] pulled the knife on me first and stabbed me on my arm." The defendant claimed to the officer that he had been dating the victim and that "she got mad" and evicted him.

TBI Forensic Scientist Kevin Helson conducted DNA testing on the knife, the used condom, and the clothing found in the Woodhollow residence. Four areas of blood on the defendant's jeans matched the defendant while two areas of blood on the same jeans were from the victim. All of the bloodstains on the shirt matched the defendant. None of the genetic material on the condom belonged to either the defendant or the victim. "[A] lot" of the victim's blood and "very little" of the defendant's blood was on the blade and the handle of the knife.

An autopsy established that multiple stab wounds caused the victim's death. The victim suffered a total of thirty-five separate wounds to her face, chest, abdomen, back, and upper extremities. There were nine significant wounds, 17 light wounds, and eight defensive wounds. According to Dr. O'Brien Cleary Smith, who conducted the autopsy, three of the wounds were severe enough to have caused the victim's death. It was his opinion that, in a murder of this nature, it would not be uncommon for the assailant to suffer self-inflicted wounds. Pressure blanching on the victim's right ring finger indicated that she had worn a ring before her death. Dr. Smith could not say with certainty, however, that she was wearing the ring at the time of her death. During cross-examination, he acknowledged that there was no indication that a ring had been forcibly removed from the victim's finger. He acknowledged that the autopsy did not rule out the possibility that the victim was the initial aggressor. Dr. Smith confirmed that the wound to the defendant's arm could have been caused by a knife and could have occurred at the time of the victim's death.

The defendant, who met the victim in 1996 when they both worked for a company called Friction Masters, claimed he had a romantic relationship with her which continued until her death. He claimed that the victim often spent the weekends with him at the residence he rented from her.

The defendant contended that the two traveled to a casino in Mississippi on several occasions and that on one such occasion, the victim stabbed him when he called her by another woman's name.

According to the defendant, the victim encountered financial difficulty in the months before her death and had asked him to help with her income by "running drugs." He stated that on two different occasions, the victim provided him with a rental car that he then drove to various locations to pick up drugs. In return, the victim paid the defendant $1,500 on one occasion and $1,000 on another. He claimed that the victim failed to pay him after he drove to Nashville to pick up drugs four days before the victim's death.

The defendant contended that he had to use the knife to forcefully enter his bedroom inside the Woodhollow residence on the date of his altercation with the victim because the door was locked and he had no key. The defendant testified that the victim telephoned him at approximately 5:30 p.m., explaining that she had not paid him for his latest trip because "something came up." He stated that he terminated the conversation when she asked him to travel to Jackson, Mississippi, to pick up more drugs.

The defendant claimed that later, the victim came into the bathroom where he had showered, and the two had "quick sex" twice, once in an upstairs bedroom and once in his bedroom. He testified that when the victim again asked him to travel to Mississippi on her behalf, he refused, explaining that she had not paid him for the previous trip. The defendant contended that when he asked the victim about a ring he had loaned her three years earlier, she became angry, informed him that she had sold the ring, and then threw a ring at him that she had taken from her finger. He claimed that when he demanded $1,000 for his Nashville trip and threatened to tell her employer that she was "running drugs through Fed Ex," the victim spit in his face and he then slapped her. The defendant testified that the victim then grabbed the knife off of the table, shouting, "I'm going to kill you," as she stabbed him twice on the right arm and once in the stomach. According to the defendant, the two struggled and fell to the ground, where he was able to gain control of the knife and stab the victim. The defendant testified that after the altercation, the victim asked for a drink of water from the kitchen and when he returned, she was dead.

The defendant testified that he wrapped a shirt around his bleeding arm and stayed in or near the residence until the next afternoon, when he took a cab first to a Walgreens pharmacy and then to a pawn shop, where he pawned the ring. He admitted that when he returned to the Woodhollow residence, he concealed the body in the closet and then drove the victim's car to a Red Roof Inn for the night. The defendant maintained that when he returned to the Woodhollow residence on the following day, he saw police cars at the residence and fled. He acknowledged that he did not inform the police of the stabbing, explaining, "I knew I had waited too late, and they had discovered her and I knew they wasn't going to believe what I said."

Donyel Johnson, who met the defendant in 1998 when they worked together, testified that he later rented a room in the Woodhollow residence. He claimed that the defendant and the victim

were romantically involved at the time and that he moved out of the residence approximately one year before the victim was killed.

Officer Alan Little, who appeared as a defense witness, testified that when the defendant was photographed at the hospital after the wreck, he informed officers that he had received a stab wound two weeks before the wreck during a fight with his girlfriend.

I

The defendant first asserts that the evidence is insufficient to support the conviction. He contends that the state failed to prove beyond a reasonable doubt that he did not kill the victim in self-defense. Alternatively, he claims that the state failed to prove that he did not kill the victim as a result of passion produced by adequate provocation and, as a result, the conviction should be modified to voluntary manslaughter.

On appeal, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas v. State, 199 Tenn. 298, 286 S.W.2d 856, 859 (1956). Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992).

Second degree murder is "a knowing killing of another." Tenn. Code Ann. § 39-13-210(a). Voluntary manslaughter is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a). Both offenses require at least a knowing mental state. With regard to these offenses, "[a] person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result[.]" Tenn. Code Ann. § 39-11-106(a)(20). Tennessee Code Annotated section 39-11-611 provides, in pertinent part, as follows:

A person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must

-5-

be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force.

Tenn. Code Ann. § 39-11-611(a).

Here, the defendant admitted that he killed the victim but claimed that he did so in self-defense. He contended that the victim was the first aggressor, that she threatened to kill him, and that he retaliated only after she stabbed him twice in the arm and once in the abdomen. The victim suffered a total of thirty-five separate wounds, three of which would have been sufficient to cause her death. While the defendant claimed that he did not intend to kill the victim, he admitted that he did not report the altercation and did not seek medical treatment for the victim. On the day following her death, the defendant hid the victim's body in a closet, pawned her ring, and fled the state in her car. When identified in California, the defendant led officers on a high speed chase that ended only after the defendant wrecked. The victim's wallet and other possessions were found in the stolen vehicle. The trial court provided jury instructions on both self-defense and voluntary manslaughter. The jury, as was their prerogative, accredited the testimony of the state's witnesses and rejected the defendant's claim that he killed the victim either in self-defense or after adequate provocation. See State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997) ("It is well settled that whether an individual acted in self-defense is a factual determination to be made by the jury as the sole trier of fact."). In our view, the evidence was sufficient to support the conviction.

II

The defendant also contends that the trial court erred by denying his motion to dismiss the indictment and remand the case to the General Sessions Court for a preliminary hearing. The state submits that the defendant had no right to a preliminary hearing because he was not arrested prior to being indicted.

"[W]hile a preliminary hearing is not constitutionally required, it is a critical stage of a criminal prosecution mandated by statutory law, and is an adversary proceeding at which the usual rules of evidence apply." Moore v. State, 578 S.W.2d 78, 80 (Tenn. 1979). In Moore, our supreme court held that "a preliminary hearing is mandated only in those cases wherein the defendant has been arrested -- with or without a warrant -- and is not a demandable right where the prosecution originated by presentment or indictment." Id. Our high court stated that "[i]t is the prerogative of the District Attorney General and law enforcement personnel to omit the arrest procedure and take prosecutions directly to the grand jury." Id. This court has held that the defendant is not entitled to a "post-indictment determination of probable cause by a magistrate, a determination already made by the grand jury." State v. Lawson, 794 S.W.2d 363, 366 (Tenn. Crim. App. 1990). Because the prosecution began with an indictment rather than an arrest, the defendant was not entitled to a preliminary hearing. Under these circumstances, the trial court did not err by refusing to dismiss the indictment and remand the case for a preliminary hearing.

The defendant asserts that the trial court erred by admitting testimony about his arrest in California and his fraudulent use of a company credit card while he was on the lam. He claims that the evidence was irrelevant, that it was improper propensity evidence, and that it was more prejudicial than probative. The state submits that evidence concerning the defendant's flight to and subsequent arrest in California was relevant to show intent and guilty knowledge. The state further submits that evidence regarding the use of the credit card was relevant to show how the defendant financed his cross-country trip and that the defendant was not prejudiced by its admission.

The admission of this evidence is governed by Tennessee Rule of Evidence 404. That rule provides in pertinent part as follows:

> Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing inquiry on cross-examination about specific instances of conduct are:
> (1) The court upon request must hold a hearing outside the jury's presence;
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and
> (3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). A fourth prerequisite to admissibility is that the trial court find by clear and convincing evidence that the defendant committed the other crimes or bad acts. State v. DuBose, 953 S.W.2d 649, 654 (Tenn. 1997). Rule 404 was patterned in great measure on State v. Parton, 694 S.W.2d 299 (Tenn. 1985), wherein our supreme court ruled that evidence of other crimes is generally inadmissible. The terms of this rule establish that character evidence cannot be used to prove that a person has a propensity to commit a crime. Tenn. R. Evid. 404(b); State v. Adkisson, 899 S.W.2d 626 (Tenn. Crim. App. 1994). Most authorities suggest that trial courts take a "restrictive approach of 404(b) . . . because 'other act' evidence carries a significant potential for unfairly influencing a jury." Neil P. Cohen et al., Tennessee Law of Evidence § 4.04[8][e] (4th ed. 2000). That perhaps best explains the traditional posture of the courts that any testimony of other bad acts by a defendant is not usually admissible when used as substantive evidence of guilt of the crime on trial. Parton, 694 S.W.2d at 302-03. In those instances where the other conduct or acts are similar to the crimes on trial, the potential for a prejudicial result increases. State v. Bordis, 905 S.W.2d 214, 232 (Tenn. Crim. App. 1995).

Unlike the Federal rule barring such evidence, our rule does not specifically enumerate the purposes for which such evidence may be offered. State v. Gilliland, 22 S.W.3d 266, 271 (Tenn. 2000). The Advisory Commission specifically omitted such a list so that lawyers and judges would "'use care in identifying the issues to be addressed by the Rule 404(b) evidence.'" Id. (quoting Neil

P. Cohen et al., Tennessee Law of Evidence § 404.6, at 169 n.457 (3d ed. 1995)). Therefore, in every case in which evidence of other crimes, wrongs, or acts is offered, the trial court should carefully scrutinize the relevance of the evidence and the reasons for which it is being offered. Id. Although Rule 404(b) does not explicitly list these exceptions, our courts have held that evidence of other crimes may be admissible to show motive, intent, guilty knowledge, identity of the defendant, absence of mistake, and the existence of a common scheme or plan. See, e.g., Collard v. State, 526 S.W.2d 112, 114 (Tenn. 1975); see also Neil P. Cohen et al., Tennessee Law of Evidence § 4.04[8] (4th ed. 2000). Even if the challenged evidence is relevant to an issue other than character, it must be excluded if the danger of unfair prejudice outweighs the probative value of the other crime evidence. State v. Howell, 868 S.W.2d 238, 254 (Tenn. 1993); see also State v. Zagorski, 701 S.W.2d 808 (Tenn. 1985); State v. Taylor, 669 S.W.2d 694 (Tenn. Crim. App. 1983). Because the trial court substantially complied with the requirements of Rule 404(b), this court will review the trial court's determination for an abuse of discretion. See DuBose, 953 S.W.2d at 652.

At trial, the defendant claimed that he killed the victim in self-defense. He also testified, however, that after stabbing the victim, he concealed her body, pawned her jewelry, and fled, eventually driving to California. The California authorities testified that when the defendant was confronted, he led them on a high speed chase, frantically attempting to avoid capture. In our view, this testimony was relevant to show the defendant's knowledge of his own guilt, a permissible purpose under the rule. See State v. Braggs, 604 S.W.2d 883, 886 (Tenn. Crim. App. 1980) ("A defendant's flight or attempt to conceal himself after the commission of a crime may be shown as a circumstance tending to indicate guilt."). That the defendant concealed the body, fled to California and tried to escape from the police tends to discredit the claim that he acted in self-defense. See State v. Stout, 46 S.W.3d 689, 718 (Tenn. 2001) (holding that other crimes evidence was admissible to show the defendant's guilty knowledge when proof of the other crime tended to negate the defendant's "protestations of innocent presence"). In addition, the prejudicial effect of this evidence, if any, was outweighed by its probative value. Under these circumstances, the trial court did not err by admitting the evidence.

With regard to the testimony concerning the defendant's fraudulent use of his company credit card, the state elicited the testimony to establish how the defendant financed his trip to California. Because it was a part of the evidence of the defendant's concealment of his crime and his flight from this jurisdiction, this testimony was relevant and admissible as an exception to Rule 404(b). In our view, the probative value of the evidence was not outweighed by the prejudicial effect.

IV

The defendant contends that the trial court erred in the jury instruction as to the issue of self-defense. He argues that the trial court should have provided an instruction on subsection (b) of the self-defense statute, which provides as follows:

Any person using force intended or likely to cause death or serious bodily injury within the person's own residence is presumed to have held a reasonable fear of imminent peril of death or serious bodily injury to self, family or a member of the

household when that force is used against another person, not a member of the family or household, who unlawfully and forcibly enters or has unlawfully and forcibly entered the residence, and the person using the force knew or had reason to believe that an unlawful and forcible entry occurred.

Tenn. Code Ann. § 39-11-611(b). The state submits that the instructions, as provided, were proper.

Under the United States and Tennessee Constitutions, a defendant has a constitutional right to trial by jury, which dictates that all issues of fact be tried and determined by twelve jurors. U.S. Const. amend VI; Tenn. Const. art. 1, § 6; see State v. Bobo, 814 S.W.2d 353, 356 (Tenn. 1991); Willard v. State, 174 Tenn. 642, 130 S.W.2d 99 (1939). This right encompasses the defendant's right to a correct and complete charge of the law. State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). In consequence, the trial court has a duty "to give a complete charge of the law applicable to the facts of a case." State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986); see State v. Forbes, 793 S.W.2d 236, 249 (Tenn. 1990); see also Tenn. R. Crim. P. 30.

Our law requires that all of the elements of each offense be described and defined in connection with that offense. See State v. Cravens, 764 S.W.2d 754, 756 (Tenn. 1989). When the evidence in the record fairly raises or supports the existence of a defense, the trial court is compelled to instruct the jury on the issue. Manning v. State, 500 S.W.2d 913, 915-16 (Tenn. 1973); see also Almonrode v. State, 567 S.W.2d 184, 187 (Tenn. 1978). As part of its instruction, the trial court must inform the jury that any reasonable doubt on the existence of the defense requires acquittal. Tenn. Code Ann. § 39-11-203(c); State v. Bult, 989 S.W.2d 730, 733 (Tenn. Crim. App. 1998); State v. Shropshire, 874 S.W.2d 634, 639 (Tenn. Crim. App. 1993). This court has added that "due process requires that a criminal defendant be afforded a meaningful opportunity to present a complete defense, which includes the right to have the jury instructed regarding fundamental defenses raised by the evidence." State v. Michael S. Nevens, No. M2000-00815-CCA-R3-CD (Tenn. Crim. App., at Nashville, April 27, 2001); see also Tenn. Code Ann. § 39-11-203(c), (d).

Whether the evidence has raised a defense and, therefore, requires a jury instruction depends upon an examination of the evidence in the light most favorable to the defendant. Bult, 989 S.W.2d at 733. Tennessee Code Annotated section 39-11-611 provides, in pertinent part, as follows:

A person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force.

Tenn. Code Ann. § 39-11-611(a). Here, the evidence raised the issue of self-defense. Thus, the trial court was required to, and did, charge the jury on self-defense. The trial court instructed the jury as follows:

> Included in the defendant's plea of not guilty is his plea of self-defense.
>
> When a person is assaulted, by the use of force, in such a way as to create in his mind a reasonable belief that he is in imminent and actual danger of death or serious bodily injury, he will be justified in using force to defend himself even to the extent of killing another human being. The use of force can only be to the degree reasonably believed to be immediately necessary to protect against the other's use of unlawful force. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds.
>
> A person may have been mistaken, based on his perception of the circumstances, as to the extent of the actual danger, but if he acts in self-defense from honest, even though mistaken, convictions as to the extent of danger he will not be held criminally liable for his action.
>
> In determining whether the defendant's use of force in defending himself was reasonable, you may consider not only his use of force but also all the facts and circumstances surrounding and leading up to it. Factors to consider in deciding whether there were reasonable grounds for the defendant to fear death or serious bodily injury from the deceased include but are not limited to any previous threats of the deceased made known to the defendant; the character of the deceased for violence, when known to the defendant; the animosity of the deceased for the defendant, as revealed to the defendant by previous acts and words of the deceased and the manner in which the parties were armed and their relative strengths and sizes.
>
> If you find that the defendant's fears of death or serious bodily injury were genuine and reasonable under the circumstances, then he would have had the right to use as much force as was apparently necessary in his own self-defense. If, on the other hand, you find that the defendant was not genuinely or reasonably fearful of death or serious bodily injury, or that he used force going beyond the real or apparent necessity for his own defense, then his use of force would not have been justified.
>
> There is no duty to retreat before a person uses force.
>
> The use of force against another is not justified if the defendant provoked the deceased's use of unlawful force, unless the defendant abandoned the encounter or clearly communicated to the deceased the intent to do so, and the deceased nevertheless continued to use unlawful force against the defendant.

If the deceased had become disarmed or helpless, or all danger to the defendant had disappeared, then the defendant's right to self-defense would not justify his conduct.

The defendant asked the trial court to include in its instructions that portion of the statute which says that "[a]ny person using force intended or likely to cause death or serious bodily injury within his or her residence is presumed to have held reasonable fear of imminent peril." The trial court refused, observing that "if [the defendant has] had sex with [the victim] twice . . . she probably has permission to be there."

The Sentencing Commission Comments to Tennessee Code Annotated section 39-11-611(b) note that the subsection "is a restatement of a prior Tennessee statute which created a presumption that a person using force against an intruder in the residence held a reasonable fear of imminent death or serious injury." Tenn. Code Ann. § 39-11-611(b), Sentencing Commission Comments (emphasis added). This court has held that where there is no proof that the victim entered the defendant's residence "unlawfully and forcibly," the instruction is not required. State v. Billy Joe Sisk, No. 03C01-9410-CR-00367 (Tenn. Crim. App., at Knoxville, Jan. 17, 1997). In Sisk, the defendant shot the victim after the victim intervened in a confrontation between the defendant and his ex-wife. This court ruled that the trial court did not err by refusing to instruct the jury on the presumption because "nothing suggests that the victim, defendant's longtime friend and landlord, forcibly and unlawfully entered the defendant's house." Id., slip op. at 11.

While there was some proof that the victim had not been invited into the Woodhollow residence by the defendant on the day of the offense, there was no proof that she entered the residence "unlawfully and forcibly," as required before an instruction should be given. The proof established that she had asked all the tenants, including the defendant, to vacate the residence so that she could sell it. The defendant admitted that he was preparing to move and officers observed boxes filled with the defendant's belongings in the residence. Further, the defendant claimed that he and the victim had dated for years and that she often visited the residence. That the defendant and the victim engaged in sexual intercourse twice before the altercation establishes that the victim's entry into the residence was neither unlawful nor forcible. At the very least, the defendant acquiesced to the entry. In addition, the defendant conceded that he had no fear of the victim until she picked up the knife during their argument in the living room. Under these circumstances, it is our view that the trial court did not err by refusing to provide the requested instruction. Moreover, even if there was error by the trial court's failure to instruct the jury as requested, such error, by our assessment, was harmless beyond a reasonable doubt. There were extensive instructions on self-defense. The number and extent of the knife wounds the defendant admittedly inflicted, his concealment of the body, his theft of the car, his flight from the jurisdiction, and his attempt to evade arrest in California constitute overwhelming evidence of guilt, far more evidence than necessary to overcome any presumption of self-defense.

V

The defendant asserts that the cumulative effect of the errors at trial denied him the right to a fair trial. Because there was no accumulation of errors during the course of the trial and because any error, under these circumstances, can be classified as harmless beyond a reasonable doubt, the defendant is not entitled to relief on the basis of that claim. See, e.g., State v. James Clayton Young, No. 01C01-9605-CC-00208 (Tenn. Crim. App., at Nashville, May 22, 1998).

VI

Finally, the defendant asserts that the twenty-three-year sentence is excessive. He contends that the trial court erred by applying two enhancement factors based upon his conduct during the police chase in California. The state submits that the trial court erred by failing to impose the maximum sentence of twenty-five years. In addition, the defendant has asked this court to consider the impact of the United States Supreme Court decision in Blakely v. Washington, 542 U.S. ____, 124 S. Ct. 2531 (2004).

When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a de novo review with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991); see State v. Jones, 883 S.W.2d 597, 600 (Tenn. 1994). "If the trial court applies inappropriate factors or otherwise fails to follow the 1989 Sentencing Act, the presumption of correctness falls." State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992). The Sentencing Commission Comments provide that the burden is on the defendant to show the impropriety of the sentence. Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments.

Our review requires an analysis of (1) the evidence, if any, received at the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210; State v. Smith, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987).

In calculating the sentence for a Class A felony conviction, the presumptive sentence is the midpoint within the range if there are no enhancement or mitigating factors. Tenn. Code Ann. § 40-35-210(c). If there are enhancement factors but no mitigating factors, the trial court shall set the sentence at or above the midpoint. Tenn. Code Ann. § 40-35-210(d). If there are mitigating factors but no enhancement factors, the trial court shall set the sentence at or below the midpoint. Id. A sentence involving both enhancement and mitigating factors requires an assignment of relative weight for the enhancement factors as a means of increasing the sentence. Tenn. Code Ann. § 40-35-210(e). The sentence should then be reduced within the range by any weight assigned to the mitigating factors present. Id.

-12-

In arriving at the twenty-three-year sentence, the trial court applied the following enhancement factors:

(2)     The defendant has a history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range;

(6)     the defendant treated the victim with exceptional cruelty during the commission of the offense;

(10)    the defendant possessed or employed a deadly weapon during the commission of the offense;

(11)    the defendant had no hesitation about committing a crime when the risk to human life was high; and

(17)    the crime was committed under circumstances under which the potential for bodily injury to a victim was great.

See Tenn. Code Ann. § 40-35-114(2), (6), (10), (11), (17) (2003). The trial court found no mitigating factors.

The defendant asserts that the trial court erred by applying enhancement factor (11), that the defendant had no hesitation about committing a crime when the risk to human life was high, and enhancement factor (17), that the crime was committed under circumstances under which the potential for bodily injury to a victim was great. The state concedes that the trial court erred by applying those factors, but asserts that any weight given to them should be reassigned to enhancement factor (2) so that the sentence would remain the same despite the error.

The trial court applied both enhancement factor (11) and (17) based upon the defendant's conduct during the California police chase:

I also find factor Number 11, that the defendant had no hesitation about committing a crime when the risk to human life was high. Now, in this case that's an element of the offense as to the victim. However, my concern is as to all the other people he endangered while running from the police.

              *                 *                *

Looking at factor Number 17 as well, same as factor Number 11, the crime was committed under circumstances under which the potential for bodily injury to the victim was great. And this is the chase. Obviously I can't use that in the murder second conviction as an element of the offense, but he endangered other people when he was running from the police.

The court gave "a fair amount of weight" to these factors, finding that "[t]hey're worth two years. And if those are proper factors he gets two extra years for doing that." The trial court noted that had enhancement factors (11) and (17) not been applied, he would have imposed a sentence of twenty-one years, one year above the presumptive midpoint.

As conceded by the state, neither of these factors is applicable to the defendant's conviction for second degree murder. As the trial court noted, factor (17) is inherent in the offense of second degree murder. In any homicide case, there is not only the risk but also the realization of bodily

injury to the victim. Further, the events which occurred in California some two weeks after the murder could not serve as the basis for the application of this factor because the factor only applies to the potential for bodily injury to a victim. None of the people endangered during the police chase qualifies as a victim. The crimes in that jurisdiction were separate. Accordingly, the trial court erred by applying enhancement factor (17).

With regard to factor (11), this court has held that this factor may be applied to a second degree murder conviction when there is proof that the defendant endangered the lives of persons other than the victim. See State v. Bingham, 910 S.W.2d 448 (Tenn. Crim. App. 1995). In this case, however, there was simply no proof that the defendant endangered the life of anyone other than the victim during the commission of the murder. In consequence, the trial court erred by applying enhancement factor (11).

The defendant next contends that the application of enhancement factor (6), that the defendant treated the victim with exceptional cruelty, is not supported by the record. Application of this factor requires a finding of cruelty over and above that inherently attendant to the crime for which the defendant is convicted. State v. Embry, 915 S.W.2d 451, 456 (Tenn. Crim. App. 1995). In other words, such evidence must "denote[] the infliction of pain or suffering for its own sake or from the gratification derived therefrom, and not merely pain or suffering inflicted as the means of accomplishing the crime charged." State v. Kelly Haynes, No. W1999-01485-CCA-R3-CD (Tenn. Crim. App., at Jackson, Mar. 14, 2000). Enhancement factor (6) has typically been applied in situations where the victim was tortured or abused. See State v. Davis, 825 S.W.2d 109, 113 (Tenn. Crim. App. 1991). This court has upheld the application of this factor based on proof of extensive physical abuse or torture, see State v. Williams, 920 S.W.2d 247, 259 (Tenn. Crim. App. 1995), as well as proof of psychological abuse or torture, see State v. Thomas Lebron Mills and Carl Franklin Mills, (Tenn. Crim. App., at Knoxville, Dec. 19, 1985) (holding that acts of mental cruelty, by themselves, can be as vicious and scarring as acts of physical cruelty).

Here, the trial court applied this factor based upon the defendant's actions after stabbing the victim. The defendant chose not to summon medical help, concealed the crime, and, on the following day, pawned the victim's ring and fled to California in the victim's car. Although she had been stabbed some thirty-five times, the victim, according to the defendant, was alive and asked for a glass of water. Eight of the victim's wounds were defensive in nature. It is our view that the defendant demonstrated a culpability greater than that necessary to commit the crime itself. The trial court did not err by applying this factor.

In summary, the trial court, under the terms of the 1989 Sentencing Act, should not have applied enhancement factor (11), that the defendant had no hesitation about committing a crime when the risk to human life was high, or (17), that the crime was committed under circumstances under which the potential for bodily injury to a victim was great. The trial court appropriately applied enhancement factors (2), that the defendant has a history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range, (6), that the defendant treated the victim with exceptional cruelty during the commission of the crime, and (10), that the

defendant employed a deadly weapon during the commission of the crime. The trial court noted that enhancement factor (6) was entitled to "little weight." It is our view that despite the brutality of the crime, the misapplication of two enhancement factors would require a modification of the sentence from twenty-three years to twenty-two years.

The United States Supreme Court's recent opinion in Blakely v. Washington, 542 U.S. ____, 124 S. Ct. 2531 (2004), however, calls into question the continuing validity of our current sentencing scheme. In that case, the Court, applying the rule in Apprendi v. New Jersey, 566 U.S. 466, 490 (2000), struck down a provision of the Washington sentencing guidelines that permitted a trial judge to impose an "exceptional sentence" upon the finding of certain statutorily enumerated enhancement factors. The Court observed that "the 'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Id. at 2537 (emphasis in original). Finally, the Court concluded that "every defendant has a right to insist that the prosecutor prove to a jury [beyond a reasonable doubt] all facts legally essential to the punishment." Id. at 2543 (emphasis in original).

Under the rule established in Blakely, the defendant's prior convictions may be used to enhance the sentences. The trial court in this instance gave "a fair amount of weight" to a prior conviction involving an assault on a police officer. The trial court stated that it was "not concerned" about a prior conviction for driving on a revoked licence. Factors (6) and (10), neither of which are based upon the defendant's prior convictions, were not admitted by the defendant. In consequence, the holding in Blakely would preclude their application. Under the rationale of Blakely, which controls, a sentence of twenty-one years, one year above the presumptive sentence, is warranted.

Accordingly, the judgment of the trial court is affirmed as modified.

 

_____
GARY R. WADE, PRESIDING JUDGE